A. Brigham Rose and Zelletta Rose v. Commissioner. Lori, Ltd., Incorporated v. Commissioner. Zelletta M. Rose v. Commissioner. A. Brigham Rose v. Commissioner.
Rose v. Commissioner
Docket Nos. 5138, 5157, 11737, 11738.
United States Tax Court
1949 Tax Ct. Memo LEXIS 300; 8 T.C.M. (CCH) 8; T.C.M. (RIA) 49005; January 6, 1949
A. Brigham Rose, Esq., for the petitioners. R. E. Maiden, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion In these proceedings respondent determined deficiencies in income tax and fraud penalties against the individual petitioners, as follows: Docket No.
Petitioners
Year
Deficiency
50% Penalty
5138
A. Brigham Rose and Zelletta Rose
1940
$1,658.81
$ 829.41
11737
Zelletta M. Rose
1939
1,414.95
1941
1,683.90
11738
A. Brigham Rose
1938
2,792.60
1,396.30
1939
1,414.95
707.48
1941
1,683.90
841.95
*301 In Docket No. 5157, deficiencies and penalties were determined against the corporate petitioner, as follows: Year
Kind of Tax
Deficiency
25% Penalty
50% Penalty
1938
Income
$3,574.45
$1,787.23
1939
Income
3,363.20
1,681.60
1940
Income
2,402.09
1,201.05
1941
Income
2,664.57
1,332.29
1938
Excess Profits
2,705.83
1,352.92
1939 *
Declared Value Excess Profits
2,565.93
1,282.97
1940
Declared Value Excess Profits
1,794.68
897.34
1941
Declared Value Excess Profits
1,755.58
877.79
1940
Excess Profits
2,130.68
$532.67
1,065.34
1941
Excess Profits
3,779.94
944.99
1,889.97
In his answer, respondent alleges that the corporation income and excess-profits tax returns (Form 1120A) filed by Lori, Ltd., Incorporated, hereinafter sometimes referred to as Lori, for the calendar years 1938 and 1939 do not constitute "returns" within the meaning of the applicable sections of the Revenue Act of 1938 and the Internal Revenue Code, and that there are, therefore, due and owing from the corporate petitioner, in addition to the above deficiencies and penalties as determined in *302 the statutory notice, the 25% penalties for failure to file proper returns in the following respective amounts: Year
Kind of Tax
25% Penalty
1938
Income
$893.61
Excess-profits
676.46
1939
Income
840.80
Excess-profits
641.48
The deficiencies result from respondent's increase of petitioners' income based primarily upon a reconstruction of bank deposits and the disallowance of certain deductions and losses which respondent claims are unsubstantiated. The fraud penalties were determined under section 293(b) of the Internal Revenue Code. The 25% penalties against the corporate petitioner were determined for failure to file returns. Findings of Fact Petitioners A. Brigham Rose and Zelletta Rose are husband and wife domiciled in the State of California. Hereinafter, A. Brigham Rose will be referred to as petitioner. They filed their income tax returns for the years 1938 through 1941 on a cash-calendar year basis, giving the address of petitioner's office at 205 South Broadway, Los Angeles, California. The returns were filed with the collector for the sixth district of California. Lori, the corporate petitioner, is a corporation *303 organized under the laws of California in 1935, with its principal offices stated to be in petitioner's office. It was authorized by its charter to engage in general business activities, and did engage in the business of holding real estate. At all times material, petitioner was president and treasurer of Lori, and was in sole control of its operations. Without necessity of any additional authorization or any signature other than his own, he could withdraw funds from Lori's bank account. Of the six issued shares of stock of Lori, two were held by petitioner, two were issued in the name of Paul Angelillo, who was its vice-president, and was also an attorney associated with petitioner maintaining his office at the same address, and the remaining two shares were issued in the name of P. M. Woods, the stepfather of Mary Allen, who was a client of petitioner. It was contemplated by Rose that additional shares of stock should be issued by Lori to him but this was never done. Petitioner and his wife came to California in 1927, at which time he was admitted to the Bar and commenced the practice of law. Since that time he has engaged in the practice of that profession in Los Angeles. *304 Petitioner filed an income tax return, Form 1040, for the year 1938, on which appeared, in addition to his name and address, only the following: "From various interests and personally, have handled sum greatly in excess of $5,000.00 for the taxable year of 1938, but have expended and borrowed a sum in excess of the amount handled, but unfortunately, the records requisite to rely on for details are not available to me for diverse reasons. I am, therefore, making this return: THAT I OWE NOTHING, and will supplement this Income Tax Return on request." Petitioner and his wife filed separate returns for the year 1939 on a community property basis. There was reported therein a net community loss of $4,232.71 from rental property, and net income of $10,312.55 from legal business. The total gross receipts from legal business were stated on the returns to be in the amount of $17,154.78. The net community income reported on the returns of petitioner and his wife for the year 1939, after all deductions, was $6,079.84. A joint tax return was filed by petitioner and his wife for the calendar year 1940, reporting net income of $2,636.57. Included in that total was net income from legal business *305 amounting to $1,411.66. For the year 1941 separate returns were filed by petitioner and his wife disclosing community receipts in the amount of $29,719.76. Included therein was net profit from legal business of $31,758.27. Deductions for contributions, interest, and bad debts aggregating $729.56 were claimed. During the years 1938 and 1939 petitioner carried three checking accounts in his own name with the Citizens National Trust and Savings Bank of Los Angeles. Two of the accounts remained active through 1941. The accounts were designated: A. Brigham Rose - Attorney Account; A. Brigham Rose - Special Account, and A. Brigham Rose - Trustee Account. During those years, the balances, deposits, and withdrawals in these accounts were in the following amounts: 1938
1939
1940
1941
Balance 1/1
$ 45.94
$ 356.18
$ 24.17
$ 28.96
Deposits: A.B.R. (Atty. Acct.)
$ 880.00
$ 1,449.50
A.B.R. (Spec. Acct.)
28,715.84
16,738.66
$ 7,458.74
$ 7,966.00
A.B.R. (Trustee Acct.)
14,058.11
12,461.10
8,559.35
5,298.00
Total
$43,653.95
$30,698.96
$16,018.09
$13,264.00
Withdrawals: A.B.R. (Atty. Acct.)
$ 879.83
$ 1,512.40
A.B.R. (Spec. Acct.)
28,952.26
16,884.68
$ 7,457.68
$ 7,954.77
A.B.R. (Trustee Acct.)
13,871.62
12,633.89
8,555.62
5,317.91
Total
$43,343.71
$31,030.97
$16,013.30
$13,272.68
Balance 12/31
$ 356.18
$ 24.17
$ 28.96
$ 20.28
*306 Petitioner used all of these accounts, as well as the Lori account, for his personal deposits and expenditures, and the Lori account, in particular, was used as a "sanctuary" from his creditors who had on previous occasions attached his own accounts. During all of these years petitioner's principal sources of income were from his professional fees, from rents of property which he owned, and from certain real estate operations in which Lori was interested, the actual operations being handled during part of the period by Brevoort Enterprises, Inc., a California corporation organized in 1935. Petitioner's interest in the real estate operations of Lori dates back to 1931, when he and his wife signed a note for $12,000 to be held as additional security to the holder of a first trust deed covering a hotel structure consisting of 78 rooms located in Hollywood, which was then owned by the Hotel Investment Co., of which petitioner was president and attorney. The first trust deed secured an obligation of approximately $93,000. The management of the hotel was conducted by one Robert L. Warner who was, at that time, connected by marriage to the family owning the stock of the Hotel Co., under *307 leasing arrangement not shown in the record. At the rear and adjoining the hotel were nine bungalows known as the Villa Courts. These were originally acquired by a member of the family which at one time held the stock of Hotel Investment Co., were later transferred to that company, were then transferred to Warner, were later deeded to petitioner, and in 1935 were conveyed by him to Lori. At the time petitioner signed and executed the note for $12,000, he was living in the hotel. Also, living in the hotel was one Mary Allen, for whom Rose drew a so-called spendthrift trust in 1932. Mary Allen was under the care of a nurse and was incompetent to handle her own affairs at that time. The corpus of the trust consisted of 30 railroad bonds and other securities, which she had obtained as the result of an action brought against members of her family, in which he was represented by petitioner. These securities were turned over to Warner, a business associate of Rose, who was named trustee to serve without bond. The trust was drawn by petitioner as attorney for Mary Allen. In all matters in connection therewith Mary Allen acted under the advice of Rose until 1941. Shortly after the creation *308 of this trust, Warner invested unspecified amounts of the trust funds in the hotel and Villa properties, and also in another adjoining property on Vine Street which was subject to a second mortgage held by petitioner. No accounting was made by Warner or requested of him by petitioner, although petitioner was attorney for Mary Allen, and was also financially involved in the operation of the hotel, the Villa Courts, and the Vine Street property. The investment of these funds by Warner in these various properties precipitated his resignation in 1935 after an investigation by Mary Allen's father. [1] At about that time one Paul Angelillo, a lawyer associated with petitioner, acquired title to the hotel property and petitioner as trustee acquired title to the Villa Courts which he then conveyed to Lori. Paul Angelillo conveyed the legal title to the hotel property to petitioner's wife in 1944. The Vine Street property was bought in by petitioner personally in 1936 at a foreclosure sale involving a first mortgage thereon. Petitioner's bid at the foreclosure sale was $22,100. This property included the land and three buildings. The hotel property, title to which was in Angelillo, and the Villa *309 Courts, title to which was in Lori, were beneficially owned by Rose, subject to the encumbrances against them and the unliquidated claim of Mary Woods against Rose, arising out of the trust of which she was beneficiary. Her claim was in 1941 formally recognized when Rose agreed to pay her $200 a month during her life, which obligation was to be secured by mortgages covering the hotel properties and the Villa Courts, pursuant to a contract by which Rose agreed to cause Angelillo to mortgage the Hotel property and Lori to mortgage the Villa Courts. In 1938 petitioner appointed himself as trustee of the Mary Allen trust, but did not, at that time or later, transfer, or cause to be transferred to himself as trustee, any of the properties here involved. During all of the years involved petitioner made certain payments to her, most of which respondent allowed as deductions. In 1938 at least three accounts reflected proceeds from the operation of the hotel and courts. These were the *310 so-called "Harry J. Wall, Special Account" at the Citizens Bank, an account at that bank in the name of "Brevoort Enterprises, Inc." and the bank account of Lori. Wall was manager of the hotel and Villa properties during 1938. During 1938 and 1939 petitioner also advanced funds from his own accounts for the operation of the hotel. Petitioner freely transferred funds between all of these accounts without maintaining any records or without making any segregation of income, expenditures, or indebtedness of himself or the various corporate entities. During 1938, Wall maintained certain receipts and disbursements records which disclosed receipts from the hotel and the Villa properties for that year in excess of $40,000. For the month of January, 1938, the record differential between the income and the disbursements was $785.79; for February $1,175.78; for March $601.05; for April $359.96; for May $556.72; for June $888.00; for July $199.92; for August $536.36; for September $349.22; and for October $285.15. The various expenses of the operation through the month of April, 1938, were paid by checks written on the Wall account. This account became inactive in May, 1938, and thereafter *311 many disbursements by check were made by petitioner from his special account. During all years material in these proceedings, petitioner had unrestricted use of all the funds passing through the accounts of Brevoort Enterprises and Lori. In February, 1939, Brevoort Enterprises executed a five-year lease on the hotel and the Villa Courts to F. A. Linck. The lease provided for monthly payments of $1,200 as rental and an advance payment of $4,800 covering the last four months of the leasehold term. In May, 1940, Linck, in effect, surrendered the lease and a new lease contract was executed between Lori and Paul Angelillo as lessors on one hand, and G. W. Nickson and E. Sternglanz, as lessees, on the other, covering the remainder of the term of the original lease. Under this new lease, all rentals were payable to petitioner and the new lessees were given credit for the $4,800 advance payment theretofore made by Linck. It was also provided that the lessees were to be allowed $100 a month as a rebate on their rent for a period of three years to cover improvements and repairs. The understanding effected between Rose, Lori, and Angelillo was that of the receipts under the lease, one-third *312 was to be credited to Lori and two-thirds to the hotel properties, title to which was in Angelillo's name held, however, for Rose's beneficial interest. This arrangement was carried out commencing in 1940. Because of the failure of petitioners to maintain any books and records of their income and expenditures, other than miscellaneous cancelled checks and loose receipts, respondent found it necessary to reconstruct their taxable income by reference to bank deposits and other evidences of receipt of income for the years 1938 through 1941. At the time of the investigation of the income of petitioners, respondent requested that petitioner furnish accounting or other records from which his income and the income of the various corporate entities could be determined. In response to this request, petitioner presented only some cancelled checks and unclassified miscellaneous receipts. Thereafter, petitioner was required to appear in the Federal District Court in response to respondent's order for the production of records. No additional significant information was forthcoming. None of the petitioners maintained any books or records reflecting their income and disbursements, nor any other *313 documents which adequately reflected this information for any of the years involved. The net income which formed the basis of the deficiencies in these proceedings was based upon a determination that all unidentified bank deposits were taxable receipts; that payments made by petitioner to the hotel operating company represented loans to that company for operating expenses, and that personal and business expenses paid by petitioner by means of checks written on the Lori bank account constituted payments of constructive dividends taxable to petitioner to the extent that they were not otherwise explained. The income so attributed to petitioner, as set forth in the deficiency notices, results from the following computation of income and identifiable deductions: Analysis of Method Used and Adjustments made
by Statutory Notices in Arriving at the
Net Income of A. Brigham Rose for Taxable Years 1938-1941
1938
1939
1940
Deposits
43,653.95
30,698.96
16,018.09
Less
withdrawals
allowed as
deduc-
tions (a)
20,536.40
15,390.86
8,019.31
Balance
23,117.55
15,308.10
7,998.78
Less borrowed
8,850.00
2,000.00
funds
Less transfers
from Lori
Bank acct.
6,095.00
14,945.00
12,299.65
14,299.65
1,481.90
8,172.55
1,008.45
6,516.88
Plus known cash
fees not
17,500.00
deposited
Less salary
from
Lori assumed to
be
in deposits
00
00
1,200.00
Net deposits
plus
known cash re-
ceived, less
withdrawals
allowed
as deductions
8,172.55
18,508.45
5,316.88
Professional
income
per return
00
10,312.55
1,411.66
Additions to
(or
reductions in)
in-
come from
8,172.55
8,195.90
3,905.22
profession
Other Additions to Income and Other Adjustments
1938
1939
1940
Additions to
Income
Income from
dividends: Silver King
Coalition
Mines
420.00
300.00
480.00
Reported
0
420.00
0
300.00
483.76
(3.76)
Income from
dividends
and/or
gains and
profits from
Lori,
Ltd., Inc., per
statutory no-
tices
15,873.23
17,776.63
8,765.60
Meals and
quarters
furnished by
Brevoort Hotel
and Lori, Ltd.,
without charge
2,100.00
900.00
900.00
Income from
rents: Reported (loss)
(4,232.71)
(458.85)
Determined
(1,548.20)
2,684.51
642.00
1,100.85
Long term
capital
loss on sale of
mining stock: Reported
Determined
Contributions
not
allowed
(not
substantiated)
Bad debts not
allowed
(not
substantiated)
18,393.23
21,661.14
10,762.69
Deductions from
income
Interest paid
191.06
194.16
288.08
1/2 community
income
transferred
to wife's
14,831.44
15,025.60
return
Total other
adjustments per
stat. Notices
18,202.17
6,635.54
10,474.61
*314 Analysis of Method Used and Adjustments made by Statutory Notices in Arriving at the
Net Incme of A. Bringham Rose for Taxable Years 1938-1941
1941
Deposits
13,264.00
Less withdrawals allowed as deduc-
tions (a)
7,360.36
Balance
5,903.64
Less borrowed funds
700.00
Less transfers from Lori
bank acct.
2,616.00
3,316.00
2,587.64
Plus known cash (fees not deposited
26,727.00
Less salary from Lori assumed to be
in deposits
1,200.00
Net deposits plus known cash re-
ceived, less withdrawals allowed
as deductions
29,314.64
Professional income per return
31,758.27
Additions to (or reductions in) in-
come from profession
(3,643.63
Other Additions to Income and Other Adjustments
1941
Additions to Income
Income from dividends:
Silver King Coalition
Mines
Reported
Income from dividends and/or
gains and profits from Lori,
Ltd., Inc., per statutory no-
tices
7,384.12
Meals and quarters furnished by Brevoort Hotel and Lori, Ltd.,
without charge
900.00
Income from rents
Reported (loss)
(945.01)
Determined
261.59
1,206.60
Long term capital loss on sale of
mining stock:
Reported
(2,773.50)
Determined
(223.50)
2,550.00
Contributions not allowed
(not substantiated)
150.00
Bad debts not allowed
(not substantiated)
460.00
12,650.72
Deductions from income
Interest paid
85.99
1/2 community income transferred
to wife's return
4,460.55
4,546.54
Total other adjustments per
stat. Notices
8,104.18
*315 1938
1939
1940
1941
Net income per return
none
3,039.92
2,636.57
14,495.10
Net income from profession
8,172.55
8,195.90
3,905.22
(3,643.63)
8,172.55
11,235.82
6,541.79
10,851.47
Plus other net income
18,202.17
6,635.54
10,474.61
8,104.18
additions
Net income adjusted per
26,374.72
17,871.36
17,016.40
18,955.65
statutory notices
(a)
List of deductions allowed in
statutory notices: Charge-backs by bank
90.40
64.50
42.50
Business expenses
4,076.40
6,881.04
3,439.58
3,213.55
Transfers between bank
2,173.00
420.00
515.00
60.00
accounts
Refund to Harry Blank
3,500.00
Payments for L. A.
7,566.57
136.99
Wholesaler's Outlet
Payments to Mary [Allen]
1,923.76
2,865.77
1,876.45
183.81
Woods
Payments to Joe Carpenter
4,000.00
Payments to others
1,206.27
1,087.06
2,123.78
3,860.50
Total deductions allowed
20,536.40
15,390.86
8,019.31
7,360.36
By reason of identification of additional checks and other evidence subsequently made available by petitioner at the hearing, respondent recognized that the community income as determined in the statutory notices should be reduced for the years 1938 *316 and 1939 in the respective amounts of $3,355 and $2,565, representing returns of advances made by Rose to Brevoort Enterprises. There should be further reductions of the sum of $1,100 for 1938, and $355 for 1939, reflecting the return by Lori to petitioner of advances on its behalf. In addition to the amounts allowed by respondent as deductions in the notice of deficiency and the concessions and adjustments indicated in the paragraph above, petitioner has established his right to decrease the taxable income determined by respondent in the following amounts: 1938
Interest
$ 553.12
Transfers between accounts
638.00
Payments to Mary Allen
160.77
Payments to L. A. Wholesaler's benefit
1,616.00
Current operating expenses of Lori
and Hotel paid from bank accounts
of Rose
10,748.62
1939
Bank loans
500.00
Payments to Mary Allen
124.94
Transfers between accounts
355.00
Payments to L. A. Wholesaler's benefit
285.00
Receipts under lease, properly ac-
countable for by Lori and hotel
3,600.00
Current operating expenses of Lori
and Hotel paid from bank accounts
of Rose
6,107.21
1940
Receipts under lease, properly ac-
countable for by Lori and hotel
1,956.41
1941
Receipts under lease, properly ac-
countable for by Lori and hotel
3,485.00
*317 The expenditures made by Rose on behalf of Lori and the hotel operations were out of funds received by Rose from Lori. Lori, in turn, received gross sums from Brevoort Enterprises covering both the hotel and Villa Court operations. By these expenditures petitioner sought to and did thereby protect and preserve his equities in the various properties, the operations of which inured to his benefit. Petitioner's analysis of his bank deposits for 1938 reflected transfers from Lori's account of $6,215 and of unidentified items aggregating $22,283.43. For 1939, receipts from the Lori account totaled $12,331.65, and the sum of $8,247.31 was unidentified. For 1940, receipts from the Lori account were in the amount of $4,476.90, and unidentified deposits were in the sum of $9,069.78. For 1941, petitioner's analysis further revealed receipts from the Lori account of $4,229 and unidentified deposits totaling $5,450. In the years 1939 and 1941 petitioner received substantial fees for his services in two cases, neither of which was deposited in his various bank accounts. The 1939 fee in the amount of $17,500 was received for services in litigation involving the International Alliance of Theatrical *318 and Stage Employees. Of this amount, $6,500 was deposited in the account of Lori, and the balance was used generally for the payment of a mortgage held by the Occidental Life Insurance Company on the property which petitioner acquired in the foreclosure sale. In November 1931 petitioner received a legal fee in the case of Howard v. Howard in the amount of $26,727, which was paid to him in two checks. One check was cashed by petitioner at his bank, but the proceeds were not deposited to his accounts. Another check in the amount of $16,727 was deposited in the account of Lori. In addition to cash income, petitioners received from Brevoort Enterprises, Inc., the hotel and Villa Court operators, in the year 1938, meals having a value of $1,200, and received living quarters from Lori in the years 1938 through 1941, having a value of $900 per year. In the year 1939 petitioner sold stock in the Silver King Coalition Mines and claimed a gross long-term capital loss thereon in the community income tax returns. This stock was acquired by petitioner as a result of a suit brought by Mary Allen involving a contest of the will of one Margaret Keith, an aunt of Mary Allen. As a result of this *319 suit, Mary Allen was awarded 4,000 shares of stock in the Silver King Coalition Mines in the year 1934. All of the stock was apparently placed in the hands of Warner, who used it as security for making loans on the hotel property, which he managed in those years. Petitioner was entitled to a 50% fee on the recovery from the Keith Estate and at some subsequent date prior to 1936, 2,000 shares of such stock were acquired by him in lieu of a cash fee. The inheritance tax on the assets received by Mary Allen from the Margaret Keith estate was paid in December, 1934, to obtain a release of the 4,000 shares of stock from the Probate Court. Two thousand shares obtained by Mary Allen were used to augment the original Mary Allen Trust and the remainder delivered to petitioner at some later date. The 1,200 shares sold by petitioner in 1941 represents a portion of this stock. Respondent allowed as a basis for this stock the amount of $4,500, the maximum allowable therefor at the date of acquisition. Petitioner and his wife understated rental income received from property which he purchased at the foreclosure sale, by their failure to establish deductible expenses or depreciation applicable *320 to that property in excess of the amounts allowed by respondent. Petitioner and his wife failed to include in their income for 1938 and 1939 dividends received on stock of the Silver King Coalition Mines in the sum of $420 for 1938, and in the sum of $300 for 1939. Dividends were overstated in 1940 by the sum of $3.76 for which respondent in the statutory notices made appropriate adjustment. Also, appropriately adjusted by respondent was a deduction in the amount of $288.08 in the year 1940 for interest paid by petitioner. Petitioner and his wife failed to substantiate a deduction in the amount of $150.00 claimed as contributions and a loss from bad debts in the amount of $460 in the same year, both of which were disallowed by respondent. In 1938, 1939, 1940, and 1942 petitioner submitted statements of financial condition to the Citizens Bank, in which he listed his assets, net worth, and annual income. These statements reflected the following information: Net
Total
Date
Assets
Worth
Income
6-11-38
$119,800.00
$103,000.00
$13,500.00
4-29-39
140,900.00
124,400.00
In excess of
10,000.00
3- 1-40
140,000.00
135,000.00
In excess of
20,000.00
9-21-42
183,900.00
178,000.00
41,800.00
*321 Any deficiencies in tax due from petitioner in the years 1938, 1939, and 1941, and from petitioner and his wife in the year 1940, are due to fraud with intent to evade tax. During the years 1938 to 1941 the balances, deposits, and withdrawals of Lori's bank account were as follows: Total Deposits and Withdrawals from Bank Accounts of Lori, Ltd., Inc.,
for Years 1938-1941
1938
1939
1940
Bank balance Jan. 1
$436.63
18.99
897.38
Total Deposits (per bank
ledgers)
25,199.37
24,723.58
18,111.43
Total Withdrawals (per
bank
ledgers)
25,617.01
23,678.53
18,513.00
Bank balance Dec. 31
18.99
897.38
495.81
Total Deposits and Withdrawals from
Bank Accounts of Lori, Ltd., Inc.,
for Years 1938-1941
1941
Bank balance Jan. 1
495.81
Total Deposits (pr bank ledgers)
34,834.82
Total Withdrawals (per bank ledgers)
35,289.58
Bank balance Dec. 31
41.05
In the absence of other evidence, the gross deposits in Lori's bank account for the years involved were assumed by respondent to represent income to the corporate petitioner, and in the statutory notice those deductions *322 were allowed which could be substantiated by checks written by Lori. The deductions allowed were $44.85 for 1938, $734.83 for 1939, $2,015.34 for 1940, $2,307.98 plus $16,727, representing a portion of a fee of petitioner deposited in Lori's account, for 1941. Net income was determined to be as follows: 1938
$25,154.42
1939
23,988.75
1940
16,096.09
1941
15,799.84
The availability of additional data has lead respondent to recognize and concede that Loriss set income as determined in the statutory notices was overstated for the years 1938 and 1939. For the year 1938 the overstatement was in the amount of $6,371.39 comprising two items: (a) $5,271.39 representing a deposit on November 7, 1938, which was the greater part of the proceeds of a $7,000 loan to petitioners by the California bank; (b) $1,100 representing a transfer from the Rose Trustee Account on the same date. For the year 1939 there was overstatement of net income as shown in the statutory notice in the amount of $15,821.51, composed of three general items: (a) $8,966.51 representing transfers to Lori's account from the bank account of Brevoort Enterprises and by the collection of rents from the *323 lessee of the hotel and Villa properties; (b) $355 representing four checks drawn on the A. B. Rose Trustee and Special Accounts as advances; (c) $6,500 representing a portion of the fee paid to petitioner in 1939 in connection with the law suit brought against the I.A.T.S.E. Respondent properly disallowed, as unsubstantiated, deductions claimed by Lori for the years, which were overstated in the purported corporate returns for the years 1939, 1940, and 1941, in the respective amounts of $12,268.18, $1,031.38, and $1,503.92. Petitioner's analysis of Lori's bank deposits reflected the following: (a) For 1938, $16,398.50 represented receipts from the hotel and Villa operations, and $2,429.48 could not be identified; (b) for 1939, $6,505.26 represented receipts from operations and receipts under the Linck lease, and $1,493.32 could not be accounted for; (c) for 1940, the sum of $8,930.92 was presumed to be proceeds from the lease of the hotel and the courts, and $6,223.75 could not be identified; (d) for 1941, the sum of $8,355 was presumed to be proceeds of the lease, and $2,167.50 could not be identified. Lori's account was used during the years in question as a depository *324 of substantial sums, in which it had no interest, including receipts from petitioner's law business and sums reflecting receipts from the hotel operations. Additional adjustments have been established, as follows: 1938
Paid to Wall for expenses of operation
and to adjust gross receipts reflect-
ing both Villa and hotel operations
$9,295.00
1940
Overstatement of receipts under lease
properly allocable to hotel and not
Lori
$4,130.92
1941
Overstatement of receipts under lease
properly allocable to hotel and not
Lori
$3,955.00
Deposit of proceeds of personal loan of
petitioner
2,605.32
For the year 1938 Lori filed a form 1120A, corporation income and excess-profits tax return, with the collector at Los Angeles, on which appeared only the following: "This corporation has gone into debt for the year 1938 and made no profits." It was signed by A. Brigham Rose. A form 1120A was filed for the year 1939, signed only by A. Brigham Rose, "Pres.," which reported income of $747.74, which represented one-third of the net profits derived from the operation of the hotel and the courts. The remaining two-thirds was shown in a schedule attached to the *325 return to be taxable to the "Mray Allen Trust, A. Brigham Rose, Trustee." Lori claimed deductions on the return in the amount of $1,595.27, and hence reported a net loss in that year. For the year 1940 Lori filed a form 1120, corporation income, declared value excess-profits, and defense tax return, in which was reported gross income from rents of $4,200. less deductions of $3,046.72. The return was signed by A. P. Angelillo as vice president and A. Brigham Orse. No excess-profits tax return was filed for that year. For the year 1941 Lori filed a form 1120, which disclosed gross income from rents of $3,600 and deductions of $3,811.90, disclosing a net loss of $211.90. This form was signed by Paul Angelillo and A. Brigham rose. None of the tax returns filed by Lori for the years 1938 to 1941 disclosed any assets, balance sheets, or surplus adjustments. Lori's failure to file excess-profits tax returns for the years 1940 and 1941 was due to willful neglect, as was its failure to file adequate returns for 1938 and 1939. Any deficiencies against Lori are due to fraud with intent to evade taxes. Opinion KERN, Judge: The failure of petitioners, by their own admissions, to *326 maintain any adequate books and records for the years involved has compelled respondent after detailed and lengthy investigation and search, with an apparent minimum of cooperation from petitioners, to use bank deposits and other evidence as a starting point for making determinations of taxable income. Such determinations are presumed to be correct, and the burden of showing error is upon petitioner. Louis Halle, 7 T.C. 245; Estate of Robert Lyons Hague, 45 B.T.A. 104; affirmed, 132 Fed. (2d) 775; certiorari denied, 318 U.S. 787; Russell C. Mauch, 35 B.T.A. 617; affirmed, 113 Fed. (2d) 555. With complete disregard of the mandate of our rules (Rule of Practice before the Tax Court, Rule 35), petitioners in their briefs have failed to "set forth complete statements of facts based upon the evidence." We have carefully considered the maze of confusing and contradictory testimony and exhibits introduced by petitioners, and we have recited in our findings of fact what we believe are the proper bases and figures from which a computation of petitioners' taxable income for the years involved can be made under *327 Rule 50. As our findings indicate, petitioners have established that they are entitled to amounts of deduction in addition to those allowed in respondent's determinations of deficiency and in addition to those conceded by him. We are of the opinion, on the basis of the record before us, that petitioner should be taxed only on the net amounts received by him from Lori, with appropriate adjustments to reflect petitioner's use of a portion of these funds to meet operating expenses of the hotel and Villa operations. Likewise, we believe that adjustments in addition to those conceded by respondent must be made in Lori's income. These are necessary to reflect deposits to its credit of funds that were not income to it, such as proceeds of petitioner's personal loans, and lease income, properly accountable for by others than Lori. Petitioners' principal contention, which is totally lacking in merit, is that since most of the monies received were paid out in one way or another, without regard to the nature of the expenditures so far as tax deductions are concerned, that taxable income was no greater than that reported. Moreover, as indicated in the findings of fact, the best petitioners *328 could do, and this in reply brief, was to conclude that as to each of the petitioners and for each of the years involved, substantial amounts of deposits could not be identified or explained. With reference to the individual petitioners, there should further be observed a substantial increase in their net worth, during the period involved, as reflected in the statements of financial condition prepared by petitioner. The falsification of such statements is a crime under California law. California Penal Code, Section 532a. As to the fraud penalties, the burden of proof is upon respondent. Internal Revenue Code, Section 1112. Respondent has asserted fraud penalties with respect to all deficiencies now in controversy against the individual petitioners, except the separate liability of petitioner's wife. We recognized in M. Rea Gano, 19 B.T.A. 518, 532-33: "To establish fraud by direct proof of intention is seldom possible. Usually it must be gleaned from the several transactions in question and the conduct of the taxpayer relative thereto. Moreover, in assaying evidence to determine the presence or absence of fraud, the scales of justice must *329 dip more heavily than in the ordinary civil case - a mere preponderance is not enough, the evidence of fraud must be clear and convincing. * * *
"Isolated instances of discrepancy or occasional lapses from the rigid accountability contemplated by the law might conceivably be overlooked, but where the whole fabric of petitioner's tax accounting is permeated with gross error, where elaborate artifice is employed to accomplish the end sought, where the evidence adduced in explanation on different occasions varies so as to make it all unreliable, where sworn statements are proven by records to be false, and where the errors both of law and of fact all tend to accomplish a reduction of apparent tax liability, the situation goes beyond mere fortuitous coincidence, or unintentional error. It evidences a purpose to evade. * * *
"A failure to report for taxation income unquestionably received such action being predicated on a partently lame and untenable exccuse, would seem to permit of no difference of opinion. It evidences a fraudulent purpose." Respondent has shown that large unexplained amounts passed through petitioner's accounts during the years involved. Not even petitioner *330 could explain all of these amounts. This must be regarded as substantial evidence to be considered in determining the question of fraud. Joseph & Lena Calafato, 42 B.T.A. 881; affirmed, 124 Fed. (2d) 187. In determining whether there has been fraud, we look to all of the facts and circumstances surrounding the conduct of petitioners' business activities and all of the facts incident to the preparation of the returns. William W. Kellett, 5 T.C. 608, 616. We find here more than mere negligence in record-keeping and in reporting income. We are convinced that, upon the record as a whole, petitioners were fraudulent, and intended, by their actions and/or omissions, to evade tax. What we said in the Halle case, supra, is pertinent here: "* * * The Commissioner has shown clearly that the petitioner received and retained, used for his benefit, or gave to his wife large amounts in each year, he received those amounts from others, and he received them as a result of his efforts in the transaction of business carried on by him for gain or profit. Such amounts were income under the broad definition of section 22(a) and the petitioner is charged with *331 knowledge of that fact. Cf. Russell C. Mauch, 35 B.T.A. 617; affd., 113 Fed. (2d) 555; Robert Burd, 19 B.T.A. 734. He was required by law to report all of that income on his returns. He failed to do so. The amounts involved could not possibly have been overlooked. His returns were all false. The irresistible inference from the facts in this record is that the petitioner intended his returns to be false and fraudulent, to evade the tax lawfully due from him. The respondent contends that he has fully sustained the burden of proof cast upon him and that he has made at least a prima facie case by clear and convincing proof. He argues that the petitioner has failed to refute or rebut this evidence. Cf. Joseph Calafato, 42 B.T.A. 881; affd., 124 Fed. (2d) 187; Oliver v. United States, 54 Fed. (2d) 48. "The petitioner is not a person who could fail to understand what the law requires of him under the circumstances of this case. He is a lawyer who has practiced his profession for many years. He is experienced not only in the field of law, but also in business. * * *." Our discussion with reference to the fraud *332 penalties determined against the individual petitioners is equally applicable to Lori, the corporate petitioner. Saven Corporation, 45 B.T.A. 343. The determination of fraud penalties is sustained. Petitioner Lori asserts no reason for its failure to file excess-profits tax returns for 1940 and 1941. Respondent's determination of penalties for failure to file these returns must be upheld. P. Dougherty Company, 5 T.C. 791; affirmed, 159 Fed. (2d) 269; certiorari denied, 331 U.S. 838. In his answer he seeks the 25% penalty for failure to file adequate tax returns (Forms 1120A) for 1938 and 1939. Among other defects, the returns prepared for those two years were signed only by "A. Brigham Rose," the one for 1939 carrying the designation after his name of "Pres." Hence, they did not comply with the statutory requirement as to execution of corporate returns. Internal Revenue Code, Section 52, and the Revenue Act of 1938, Section 52. Both are to the effect that: "* * * The return shall be sworn to by the President, Vice President, or other principal officer, and by the Treasurer, Assistant Treasurer, or Chief *333 Accounting Officer." The so-called returns here filed were inadequate and were not "returns" under the statutes. Burford Oil Co., 4 T.C. 613; affirmed, 153 Fed. (2d) 745. The failure to have the treasurer's signature, or the signature of an equivalent agent goes "to the essence of the 'required' return," and the penalties determined by respondent must be upheld. Uhl Estate Co. v. Commissioner, 116 Fed. (2d) 403. Decisions will be entered under Rule 50. Footnotes
*. So designated in statutory notice.↩
1. Not to be confused with P. M. Woods, previously referred to as Mary Allen's stepfather. About the latter (Woods) we know little except that he was a sailor and had died before the hearing herein.↩